**FELICE FEDDER ORIENTAL ART, INC., & Felice Fedder, Individually, Plaintiffs,**

v.

**James S. SCANLON & The United Kingdom, Defendants.**

**No. 81 Civ. 5168 (CBM).**

United States District Court, S.D. New York.

March 13, 1989.

Kreindler & Kreindler by Paul S. Edelman, New York City, for plaintiffs.

Mound, Cotton & Wollan by Seymour J. Ugelow, New York City, for defendants.

## OPINION

MOTLEY, District Judge.

On May 29, 1979, James Scanlon, a chauffeur employed by the United Kingdom's Mission to the United Nations, lost control of a motor vehicle owned by the United Kingdom and crashed into three stores located on Madison Avenue in New York. Scanlon was driving the car to the garage where it was stored after having driven a member of the United Kingdom diplomatic corps to his destination.

The corporate plaintiff, Felice Fedder Oriental Art, Inc. ("Oriental Art"), a lessee of one of the stores damaged in the accident, and the individual plaintiff, Felice Fedder ("Fedder"), allegedly injured as a result of the accident, jointly filed a complaint on August 19, 1981, against Scanlon, as driver of the vehicle, and the United Kingdom, as its owner ("defendants"). Fedder—the sole stockholder of Oriental Art—was in her shop at the time of the accident and was allegedly struck by falling debris and falling objects as the car crashed through the storefront window. Fedder barely missed being struck by the vehicle which stopped just short of the desk behind which she was sitting. As a result of the accident, Fedder claims she sustained serious emotional injuries as well as damage to her goods and the loss of her business. In the complaint, Oriental Art asked for one million dollars for damage to its property and business interests and Fedder claimed one million dollars in personal injury.

*Procedural History*

This court held a pre-trial conference on November 19, 1982, but defendants failed to appear claiming improper service of process. Consequently—and on plaintiffs' motion—we granted a default judgment in favor of plaintiffs on December 16, 1982. Defendants moved to vacate the default judgment and this court denied that motion by opinion of December 7, 1983. The case was referred to Magistrate Joel J. Tyler ("the Magistrate") for an inquest on damages. The Magistrate submitted his report and recommendation (the "report") on June 29, 1988, and the parties filed timely objections to the findings therein.

*Standard of Review*

28 U.S.C. § 636(b)(1)(B) provides that when a magistrate has made proposed findings and recommendations:

> [a] judge of the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendation to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate. The judge may also receive further evidence or recommit the matter to the magistrate with instructions.

*"De novo* determination" in this context has been interpreted only to require a review of the magistrate's proposed findings and an exercise of sound judicial discretion with respect to whether reliance should be placed on those findings; the reviewing court is not required to rehear testimony adduced at the magistrate's inquest. *United States v. Raddatz,* 447 U.S. 667, 671–77, 100 S.Ct. 2406, 2410–13, 65 L.Ed.2d 424 (1980).

Choice of Law

It is axiomatic that in a diversity action such as this one the court is bound by the substantive laws of the state in which it sits including that state's choice of law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Since the accident happened in New York, New York choice of law rules dictates that New York law will be applied. *Neumeier v. Kuehner,* 31 N.Y.2d 121, 128, 335 N.Y.S.2d 64, 286 N.E. 2d 454 (1972). Moreover, since neither party has raised any choice of law issues, it can be said that they have consented to the application of the forum state's law. *Clarkson Company Ltd. v. Shaheen,* 660 F.2d 506, 512 n. 4 (2d Cir.1981), *cert. denied,* 455 U.S. 990, 102 S.Ct. 1614, 71 L.Ed.2d 850 (1982).

*Discussion*

1. *Personal Injury/Medical Expenses*

The Magistrate concluded that New York law does not permit Fedder to recover for

her alleged personal injuries (Report at 10–13—hereafter "R.page # " for citation purposes). He did, however, award Fedder $10,500 for medical (psychiatric) expenses incurred as a result of the accident (R.13–14). In so finding, the report necessarily discussed the application of New York's No–Fault Insurance Law (New York Insurance Law, §§ 5101–5108) ("No–Fault") to Fedder's claims. The Magistrate determined that No–Fault is inapplicable to an auto accident case in which a default judgment has been entered against defendants (R.10). The Magistrate found that since the underlying purpose of No–Fault is "to limit the need for costly and time consuming jury trials where the aggrieved party sustained only minor personal injuries, *See Licari v. Elliot, [Elliott],* 57 N.Y.2d 230, 237–8, 441 N.E.2d 1088, 455 N.Y.S.2d 570," its legislative goals are "not implicated where the defendant is in default" (R.10). Consequently, the magistrate concluded that Fedder was not bound by the strictures of No–Fault and that New York's No–Fault law "in no way limits Fedder's right to recover damages for her personal injuries, whether physical or emotional" (R.10).

Despite this finding, no award for personal injuries was made. In denying recovery, the Magistrate stated that Fedder had failed to prove the type of direct psychic injury for which New York law permits recovery. *See Kennedy v. McKesson,* 58 N.Y.2d 500, 462 N.Y.S.2d 421, 448 N.E.2d 1332. Fedder objects and argues that she is entitled to damages for physical and emotional injuries sustained as a result of the accident. Plaintiffs' Objections to Magistrate's Report ("Plaintiffs' Objections") at 1–4. Defendants, on the other hand, object to the award for medical expenses, arguing that Fedder's claims are still subject to No–Fault despite their default. Defendants' Objections to Report and Recommendations of Magistrate Tyler ("Defendants' Objections") at 2–8. "The inapplicability of No–Fault", they argue, "is not a concominant of a default by the defendants" in an auto accident case occurring in the State of New York. Defendants' Objections at 8. Moreover, defendants argue that since Fedder failed to prove any "serious injury", she is not entitled to recover against them for her personal injuries and should be relegated to her remedies under the No–Fault statute. Defendants' Objections at 5. We agree.

New York's No–Fault statute limits the common law rights of persons to sue for personal injuries sustained in automobile accidents. *Licari* 57 N.Y.2d at 236–37, 455 N.Y.S.2d 570, 441 N.E.2d 1088. As the magistrate correctly noted, the purpose of the law is to limit the need for costly and time consuming trials when the personal injuries complained of are minor in nature. *Licari* at 237, 455 N.Y.S.2d 570, 441 N.E.2d 1088. But while a default judgment obviously cuts out a big part of the time a court would devote to a minor auto accident case, such cases can still occupy a good deal of court time and effort despite the fact that a default judgment has been entered. If a default judgment does not present the paradigm case to which the No–Fault statute is addressed, it nonetheless continues to implicate No–Fault's statutory goal.

Take this case as an example: it has already been in the court system for some seven and one-half years without any firm resolution. It required an inquest on damages that occupied four days of a federal magistrate's time and the submission of many exhibits and legal briefs. Having obviously spent a good deal of time on a thorough and thoughtful opinion, the magistrate issued a report of some fifty pages which must now be reviewed by this court. The point is that even a default judgment can cause the legal system to invest a fair bit of time on what can turn out to be a minor auto accident case. Since this is exactly what the No–Fault law is designed to prevent, a court would subvert the intention of the statute by holding that No–Fault should not apply to cases in which a defendant defaults. In the absence of any clear state law authority that No–Fault does not apply to the finding of damages following a default judgment, we are hesitant to rule that a default judgment in an auto accident case does not implicate the strictures of New York's No–Fault law.

To the contrary, our own review of New York law suggests that a default judgment does not operate as a death knell to the application of the No–Fault statute. Though discussed in the context of a jury trial, *Licari* states that it is "incumbent upon the court to decide in the first instance whether plaintiff has a cause of action to assert within the meaning of the statute." *Id.* at 237, 455 N.Y.S.2d 570, 441 N.E.2d 1088. It is the court's job to decide whether "the injury falls within the class of injuries that, under No–Fault, should be excluded from judicial remedy." *Id.* at 238, 455 N.Y.S.2d 570, 441 N.E.2d 1088. Since that is the court's responsibility, we believe it cannot and should not be avoided as a consequence of defendants' default. Under New York law, it is the court's obligation to inquire as to whether Fedder's complaint "states in some recognizable form any cause of action ... While a default admits all factual allegations of the complaint and all reasonable inferences therefrom, it does not admit legal conclusions which are reserved for the court's determination." *Silberstein v. Presbyterian Hospital*, 96 A.D.2d 1096, 1096, 463 N.Y.S.2d 254 (2d Dept.1983) (plaintiff seeking default judgment must present *prima facie* proof of a cause of action). In New York, a defendant does not admit to damages by defaulting; rather, "plaintiff [is] bound to present proof sustaining a cause of action for the recovery of the sum demanded by it on the inquest.". *Wine Antiques v. St. Paul Fire and Marine Insurance Co.*, 40 A.D.2d 657, 657, 336 N.Y.S.2d 550 (1st Dept.1972), *aff'd.* 34 N.Y.2d 781, 358 N.Y.S.2d 773, 315 N.E.2d 813. These cases say that despite entry of a default judgment, Fedder must still affirmatively prove she is entitled to maintain the action for which she is claiming damages. A default judgment does not allow this court to award damages on a claim which would otherwise not be cognizable in this forum.

With deference to the Magistrate's decision, our reading of New York law supports the application of No–Fault to the finding of damages even after a default judgment. Accordingly, we hold that defendants' default did not automatically bar the application of No–Fault to the question of Fedder's damages for alleged personal injuries. Since No–Fault can be applied, we must now see if its application is proper in this case.

The No–Fault statute, New York Insurance Law ("Ins. Law.") § 5104(a) (formerly § 673(1)), provides:

> Notwithstanding any other law, in any action by or on behalf of a *covered person* against another *covered person* for personal injuries arising out of negligence in the use or operation of a motor vehicle in this state, there shall be no right of recovery for *non-economic* loss, except in the case of a *serious injury*, or for *basic economic* loss. (emphasis supplied). *Id.*

A *covered person* as defined in Ins. Law § 5102(j) (formerly § 671(10)), means "any pedestrian injured through the use or operation of, or any owner, operator or occupant of, a motor vehicle which has in effect the financial security required by article six or eight of the vehicle and traffic law or which is referred to in subdivision two of section three hundred twenty-one of such law; or any other person entitled to first-party benefits." *Id.*

■ We agree with the magistrate that both Fedder and defendants are "covered person[s]" within the meaning of the statute (R. 8–9). The defendants are the owner and operator of a motor vehicle which must be registered and insured in compliance with Article Six of the Vehicle and Traffic Law. An occupant of a building who sustains injuries when it is struck by an automobile is also a "covered person" for No–Fault purposes. *Whiting v. Berry*, 92 Misc.2d 535, 400 N.Y.S.2d 689 (Sup.Ct., Orleans Co.1977) (occupants of a house struck by an automobile are covered persons under No–Fault statute) (citing *McConnell v. Fireman's Fund American Insurance Company*, 49 A.D.2d 676, 370 N.Y.S.2d 730 (4th Dept.1975) (test of covered person is whether operation of motor vehicle is proximate cause of injury or loss)).

Since both parties are "covered persons", the No–Fault statute would limit Fedder's

right to maintain a lawsuit for her personal injuries unless she could establish that she suffered a *"serious injury"* as defined in the statute. Section 5102(d) (formerly § 671(4)) of the Ins. Law defines "serious injury" as follows:

> 'Serious injury' means a personal injury which results in death; dismemberment; significant disfigurement; a fracture; loss of a fetus; permanent loss of use of a body organ, member, function or system; permanent consequential limitation of use of a body organ or member; significant limitation of use of a body function or system; or a medically determined injury or impairment of a non-permanent nature which prevents the injured person from performing substantially all of the material acts which constitute such person's usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment.

■ Though the magistrate did not specifically reach the question of whether Fedder sustained a "serious injury" as defined above, he did conclude that Fedder suffered "no identifiable physical injuries as a result of the accident" (R.10). That conclusion is amply supported by the record. Shortly after the accident, Fedder was examined at New York Hospital (Plaintiffs' Exhibit ("Ex.") 8; Transcript of Proceedings before Magistrate ("Tr.") at 132–33). She spent only a few hours there and took a taxi home (Tr. 132–33). The hospital report states that she was "relatively unharmed" and reports that Fedder "denies any specific injury to extremities" (Ex. 8). At most, Fedder sustained some bruises and scratches and possibly minor lacerations caused by falling debris (Tr. 128, 134).

Having sustained no important physical injuries, Fedder fails to satisfy all but the final criteria set down to define "serious injury" under No–Fault. As regards the last test, Fedder similarly cannot demonstrate that emotional trauma caused by the accident prevented her from performing most of her normal daily activities for more than 90 days within the first 180 days after the accident. Though she was undoubtedly shaken by the crash, Fedder attempted to rebuild her business and eventually reopened her gallery in late February or early March of 1980 (Tr. 142–43, 146–47). This means that within the nine months between the accident and the reopening of the gallery, Fedder functioned adequately enough to restart her business. While this is not conclusive proof that Fedder was able to perform most of her normal daily activities at all times within the first six months of the accident, there is simply no evidence in the record to support her conclusory claim that she was unable to function normally for at least 90 days of that six month period. *See* Plaintiffs' Objections at 2. Moreover, as Fedder herself testified, she did not seek psychiatric help until two years *after* the accident, and then only as a result of depression following her unsuccessful attempts to keep the gallery going (Tr. 146–47).

Taking the record as a whole, we find that Fedder did not sustain "serious injury" as defined in the No–Fault statute. And having failed to prove "serious injury", Fedder cannot recover for her alleged personal injuries. Under New York law, she is entitled only to No–Fault insurance benefits for "basic economic loss"—essentially medical bills, lost earnings, and expenses up to $50,000. Ins. Law § 5102(a) (formerly § 671). Accordingly, we decline to adopt the magistrate's recommendation that Fedder be awarded $10,500 for medical (psychiatric) expenses as this is properly a No–Fault benefit and not an item of damages that can be awarded by this court.

### 2. *Loss of Inventory/Inflation*

Defendants object to the Magistrate's finding that Oriental Art is entitled to damages of $202,657.50 for inventory lost as a result of the accident (R.20–23). As the basis for their objections, defendants argue that the award is based on insufficient evidence. We disagree.

New York law provides that a merchant may recover the wholesale value of destroyed goods: "where one is in business and his stock in trade is lost or destroyed,

the wholesale value of the merchandise is used as the basis for determining damages since that will be his replacement cost." *Irv–Bob Formal Wear, Inc. v. Public Service Mutual Insurance Co.*, 81 Misc.2d 422, 428, 366 N.Y.S.2d 596 (Civ. Ct., Queens Co.1975), *aff'd* 86 Misc.2d 1006, 383 N.Y. S.2d 832 (App. Term, 2d and 11th Jud.Dist. 1976) (citing *Dubiner's Bootery, Inc. v. General Outdoor Advertising Co., Inc.*, 10 A.D.2d 923, 200 N.Y.S.2d 757 (1st Dept. 1960)). Similarly, "[w]here property is damaged but not destroyed ... the measure of damages is the difference between the market value before the damage and the market value after." *Interested Underwriters at Lloyds as Subrogees of Everyone's Stores, Inc. v. Third Holding Corp.*, 88 A.D.2d 863, 863–64, 451 N.Y.S.2d 759 (1st Dept.1982) (citing *Dubiner's Bootery, supra*).

At the inquest, expert appraisers Marvin Sokolow and Gerald Malina testified on behalf of Oriental Art with respect to its inventory losses. Both stated that they had personally examined the damaged pieces and prepared written appraisal reports based upon their examinations (Exs. 4, 5). Sokolow valued the damaged pieces at $363,370, while Malina put the figure at $408,520 (*Id.*). Significantly, both these appraisals were based on the 1979 *retail* costs of the damaged objects and not on their wholesale replacement value (Exs 4, 5; May 15, 1984, Tr. 61–62, 109). However, while Malina stated that he could not provide the wholesale replacement cost of the pieces (Tr. 75–80), Sokolow testified that, in his opinion, the wholesale cost of replacing the damaged goods would be 50% of the retail cost or—using his own appraisal as a base—$181,685 (Tr. 113–15). He testified further that expenses incurred in replacing the items would add another 20%–30% to the overall replacement cost, resulting in a total sum—in his estimate—of approximately $225,000 (*Id.*). Finally, Sokolow stated that three-quarters of the pieces had some residual value with only 25% being completely destroyed (*Id.* at 112). As to those pieces still saleable, Sokolow testified that there was a known market for such imperfect goods and that they

could be sold for 10% of their retail value (*Id.* at 109–110). In contrast to Sokolow's testimony, Fedder herself testified that approximately 41% of the pieces on Sokolow's appraisal list—with an aggregate retail value of $209,725—had been totally destroyed (May 29, 1984, Tr. 4–6, Ex. 12). She submitted a list of these destroyed items (Ex. 12) which the Magistrate amended to his report as footnote twelve (R.n.12).

In arriving at the award for lost inventory, the Magistrate credited Sokolow's testimony and adopted $218,022 as the total replacement costs for the damaged pieces ($181,685 wholesale value plus 20%, or $36,337, for expenses) (R.22–23). He then credited Fedder's testimony that approximately 41% of the pieces on Sokolow's appraisal list, with an aggregate retail value of $209,725, had been totally destroyed (*Id.*). Based on Sokolow's appraisal figures, the Magistrate calculated that the damaged but not totally destroyed pieces had a combined retail value of $153,645 ($363,370, total retail value of all damaged pieces, minus $209,725, total retail value of all destroyed pieces) (R.n.12). Finally, crediting Sokolow's testimony that those damaged pieces had a residual value of 10%, or $15,364.50, of their retail cost, the Magistrate reduced the total wholesale replacement cost of $218,022 by $15,364.50 to arrive at a final damage award of $202,657.50 for the lost inventory (R.22–23).

Contrary to defendants' objections, this court believes that the Magistrate's determination is correct and supported by the record. Defendants did not cross-examine Sokolow as to his opinions (Tr. 116) nor did they call their own appraisers or experts to rebut his testimony. In short, they offer no substantial reason why Sokolow's testimony should not be believed. Testifying as an expert art appraiser, this court may undoubtedly credit—as the Magistrate obviously did—Sokolow's testimony as to the wholesale replacement costs of the damaged merchandise and the resale value of the saleable pieces. Malina's failure to give an opinion on the wholesale value of the goods may weigh against Sokolow's conclusions but does not negate them.

Similarly, defendants advance no good reason why this court should not credit Fedder's testimony as to the number of pieces which were totally destroyed in the accident. Fedder's testimony, like that of Sokolow, was never seriously challenged or discredited by defendants at the inquest. At most, defendants brought out the fact that Fedder and Sokolow disagreed as to the number of items which had been completely ruined (May 29, 1985, Tr. 32). But a disagreement among witnesses is no reason for a court to throw up its hands and throw out the testimony of both parties. As a trier of fact must often do, the Magistrate obviously made a credibility determination and decided that Fedder's testimony would be the basis of his decision with respect to the number of pieces damaged beyond sale. In the absence of any good reason to disturb that determination, the exercise of our "sound judicial discretion", *Raddatz, supra,* leads us to credit Fedder's testimony as to which pieces were totally destroyed in the accident.

As we read defendants' objections, their general complaint is that the evidence of record provides a less than certain basis for calculating the dollar amount of the actual damage done to each one of Oriental Art's gallery pieces. However, taking the record as a whole, we think the evidence adduced at the inquest is sufficient to sustain the Magistrate's award of $202,657 in damages for the inventory loss. In so holding, we note that New York law does not require damages to be calculable with mathematical certainty: while "[m]ere conjecture, surmise or speculation is not enough to sustain a claim for damages," *Fiederlein v. New York City Health and Hospitals Corp.,* 56 N.Y.2d 573, 574, 450 N.Y.S.2d 181, 435 N.E.2d 398, "evidence that, 'as a matter of just and reasonable inference', shows their existence and the extent thereof will suffice, even though the result is only an approximation." *Cristallina S.A. v. Christie, Manson & Woods International,* 117 A.D.2d 284, 295, 502 N.Y.S.2d 165 (1st Dept.1986) (citing *Story Parchment v. Paterson Parch. Paper Co.,* 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931)). Taking Sokolow's testimony along with

Fedder's, this court finds that Oriental Art's wholesale inventory loss has been demonstrated with sufficient certainty to enable us to adopt the Magistrate's award of $202,657.50 in property damages incurred as a result of defendants' negligence.

■ Oriental Art also argues that the Magistrate should have taken inflation into account when awarding damages for its inventory loss. Declining to take judicial notice of the Consumer Price Index, the Magistrate found that Oriental Art was entitled only to pre-judgment interest on its property loss "from the earliest ascertainable date the cause of action existed ..." New York Civil Procedural Law and Rules ("C.P.L.R.") §§ 5001(a), (b). Since this date would obviously be the date of the accident, the Magistrate awarded interest at the rate of 6% per annum from May 29, 1979, up to and including June 24, 1981, and 9% per annum thereafter. (C.P.L.R. § 5004 sets statutory rates of interest at 9% effective June 25, 1981. Prior to that date the rate was 6%. *See* N.Y. Laws 1981, ch. 258, ¶ 2). We think the Magistrate's ruling was correct.

Plaintiffs' suit is brought pursuant to the Foreign Sovereign Immunities Act (FSIA) of 1976 ("the Act"), 28 U.S.C. §§ 1602–1611 (1976). Where, as in this case, there is no immunity, the Act provides that "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances ..." 28 U.S.C. 1606. Interpreting this section, the Supreme Court has noted that only the purely federal question of sovereign immunity is to be decided on the basis of federal law: "where state law provides a rule of liability governing private individuals, the FSIA requires the application of that rule to foreign states in like circumstances." *First National City Bank v. Banco Para El Comercio Exterior De Cuba,* 462 U.S. 611, 622 n. 11, 103 S.Ct. 2591, 2598 n. 11, 77 L.Ed.2d 46 (1983).

Since New York law governs the question of damages in this case, the Magistrate correctly declined to take inflation into account. Oriental Art cites no decision

of a New York court in which the Consumer Price Index was considered in an award for property damage. To the contrary, New York law provides that the award of prejudgment interest is intended "to afford a plaintiff full indemnification for the defendant's wrongful interference with his property rights". *DeLong Corp. v. Morrison–Knudsen Co.*, 14 N.Y.2d 346, 348, 251 N.Y.S.2d 657, 200 N.E.2d 557. Since the measure of damage to property is based on its market value at the time of loss and not on its replacement value many years in the future, *see Dubiner's Bootery, supra*, Oriental Art would get an undeserved windfall if inflation were considered with regards to its property loss. Accordingly, we affirm the magistrate's decision not to account for inflation and to award only pre-judgment interest on the award of damages for Oriental Art's inventory loss.

### 3. *Warehouse Costs*

Oriental Art also seeks $7,680 for warehousing costs allegedly incurred subsequent to the accident (R.16, Tr. 166–67). Fedder testified that at various times since she closed up her store on August 31, 1988, she has been selling whatever remaining pieces she could from a warehouse or on consignment with persons out of town (Tr. 166–67). The Magistrate denied this item of damages and Oriental Art objects.

While Fedder stated at the inquest that she has been paying $136 a month in rent for warehouse space since her gallery closed (Tr. 166–67), she failed to submit any documentation to support her claim. As the Magistrate notes, "[w]hile warehouse and other miscellaneous bills were marked for identification as plaintiffs' Exh. 25 at the inquest (*see* August 17, 1985, Tr. 63–64), the documents were never submitted ..." (R.16). In fact, the exhibits and exhibit list ultimately submitted by plaintiffs stop at Exhibit 23 (R.n.11). Neither the Magistrate nor this court is obliged to award damages when a plaintiff inexplicably fails to provide important corroborative documentation in support of a claim. Accordingly, we uphold the Magistrate's deci-

sion not to award Oriental Art any damages for its alleged warehousing costs.

### 4. *Lost Profits/Lost Earnings*

■ Oriental Art seeks to recover lost profits for six years in the amount of $96,000. Fedder alleges lost earnings for six years totalling $72,000. The Magistrate denied Fedder any award for lost earnings (R.33–35), while awarding Oriental Art lost profits only for 1980 in the amount of $16,103 (R.23–30). While plaintiffs claim this to be error, we think the Magistrate's determinations are correct.

New York law does not require that lost profits be calculated with absolute certainty to be recoverable. The existence and amount of lost profits must only be reasonably certain and a product of defendants' wrongful conduct. *Borne Chemical Co., Inc. v. Herman Dictrow et. al*, 85 A.D.2d 646, 650–51, 445 N.Y.S.2d 406 (2d Dept. 1981); *see also Snyder v. Bio–Lab, Inc.*, 94 Misc.2d 816, 819, 405 N.Y.S.2d 596 (Sup.Ct., Monroe Co.1978) (recovery for lost profits allowed when they are calculable with reasonable certainty and are natural and probable consequence of defendant's conduct). Damages based on "[m]ere conjecture, surmise or speculation", however, are not sustainable. *Fiederlein, supra.*

In allowing damages for profits lost in fiscal year 1980 (ending April 30th), the Magistrate credited the testimony of Fedder's expert account, Jesse Rubenstein, that Oriental Art sustained an actual loss of $16,103 in the eleven months following the accident (Ex. 11). That figure was based on an examination of Oriental Art's business books and records and conformed with accepted principles of accounting compilation (Tr. 232–40, 248–49). As the lost profits in 1980 resulted from the disruptive effects of the accident and subsequent lost sales, we affirm the Magistrate's award of $16,103 in damages for that fiscal year.

As to the years following fiscal year 1980, the Magistrate correctly found that Oriental Art did not sustain its burden of proof with respect to the projected loss of profits. It is clear from the estimated income statement for 1977–1980 that the

business was barely profitable (Ex. 11, Tr. 240). The average net earnings of the corporation for the three years prior to the accident was only $16,093 (Ex. 11, R.29). Had Fedder drawn a more realistic salary in these years, average net earnings would have been even less. Moreover, "the corporation's sales and income figures for the pre-accident years reveal a fluctuation in profits and losses rather than a consistent annual increase from which we might reasonably conclude that its business was growing" (R.25, Ex. 11). Assuming that future corporate earnings would have remained more or less consistent with the prior earnings average, any corporate profits would have been wiped out by steadily increasing overhead expenses—which increased approximately $18,000 between 1977 and 1980 (Ex. 11)—and a projected rent increase of some $22,800 by June 1, 1983 (Ex. 11, 14).

Taking the record as a whole, we agree with the Magistrate that Oriental Art's future corporate earnings would most likely have been wiped out by economic factors independent of the accident. *See Borne* 85 A.D.2d at 651, 445 N.Y.S.2d 406. The corporation's claim that a projected increase in earnings would have taken care of the rent increase and other increasing costs is speculative at best. While Rubenstein did testify that sales were up in the five months preceeding the accident (Tr. 253–54, Ex. 11), his rosy projections as to future corporate earnings are belied by the actual earnings of the business for the years preceeding the accident (Tr. 253–54, Ex. 11). Given the net profit figures for those years—which reflect only a fluctuation in losses and gains rather than the consistent annual gains allegedly revealed in the five month study—Rubenstein's projections of future corporate earnings seem speculative and not supported by the weight of the evidence. Since we believe that any claim for lost profits in the years following the accident would be both highly speculative and not likely traceable to defendant's tortious conduct, we decline to modify the Magistrate's determination and will not award lost profits to Oriental Art for any years beyond fiscal year 1980. *Id.*

■ The Magistrate also found—and defendants do not object—that Oriental Art is entitled to pre-judgment interest on its award for lost profits. *Phelps v. A.R. Gundry, Inc.*, 23 A.D.2d 960, 961, 261 N.Y. S.2d 194 (4th Dept.1965). Since the loss of profits was not incurred on the day of the accident but from May 30, 1979 (the date of the accident), through April 30, 1980 (the end of the fiscal year in which losses were sustained), the Magistrate correctly concluded that a reasonable intermediate date from which interest should be calculated is December 1, 1979 (R.38–39). C.P.L.R. § 5001(b). Accordingly, Oriental Art is granted interest on its $16,103 award for lost profits at 6% per annum from December 1, 1979 through June 24, 1981, inclusive, and 9% per annum thereafter.

As for Fedder's lost earnings, we apply the same analysis outlined in the discussion of lost profits. Since Fedder has failed to prove that her lost business revenues were a result of the accident rather than independent economic factors, she cannot claim that defendants' negligence caused her any lost earnings in the years following the crash (R.33–35). Accordingly, we agree with the Magistrate that Fedder is not entitled to damages for her allegedly lost earnings.

### 5. Good Will

Oriental Art objects to the Magistrate's denial of its $128,000 claim for the lost good will value of the business (R.35–38). We think the Magistrate's decision was correct.

■ Since we agree with the report that Fedder failed to prove "that her business reverses were a consequence of the accident rather than a result of independent economic factors" (R.30), we note that any loss of the good will value of the business cannot be said to have been proximately caused by defendants' negligence. This alone would be sufficient to deny Oriental Art any damages for loss of good will. *See Mack v. Altmans Stage Lighting Co., Inc.*, 98 A.D.2d 468, 470–71, 470 N.Y.S. 2d 664 (2d Dept.1984) (citing *Derdiarian v.*

*Felix Contr. Co.*, 51 N.Y.2d 308, 315, 434 N.Y.S.2d 166, 414 N.E.2d 666). However, even if Oriental Art could establish proximate cause, the Magistrate correctly found that the corporation would still not be entitled to recover for any lost good will.

Under New York law, there can be no recovery for the lost good will of a business where that good will is dependent on the personal skill, judgment and reputation of a particular individual rather than on impersonal factors such as the business' location. *See Spaulding v. Benenati*, 57 N.Y.2d 418, 421, 456 N.Y.S.2d 733, 442 N.E.2d 1244 (1982). The evidence adduced at the inquest shows that Fedder's business was a function of her professional qualifications, personal skills and reputation as a dealer in oriental art. Fedder testified that she was an expert in oriental art (May 29, 1985, Tr. 32). Angela Moore, a former employee of Oriental Art with an extensive background in the field, stated that Fedder was "a dealer of fine reputation" who was "specialized" and had a small but "fine quality [collection] that was carefully chosen" (May 15, 1984, Tr. 17, 19). Similarly, and in response to the Magistrate's question as to whether Fedder could sell any of the damaged items, appraiser Sokolow testified:

> She couldn't sell them. Her reputation was as a dealer who sold perfect things of fine quality and was able to stand behind them in that respect. Her business wasn't built on her being able to sell nor was she interested in selling damaged or otherwise repaired items and there was no way her customers would want them. She had no trade of that type. She had never developed it. I don't think she knew where to find it because it was not what she was interested in (May 15, 1984, Tr. 113).

It seems clear that Fedder's business was a highly specialized undertaking whose fortunes rose or fell according to her reputation as a dealer of fine quality objects to a discriminating clientele. Taking the record as a whole, this court agrees with the Magistrate that any good will built up in Fedder's gallery was a product of her own skill and standing as a dealer in orien-

tal art. As it was personal to her, such good will "is inseperable from [Fedder] and follows [her] wherever [she] goes". *Spaulding* at 421, 456 N.Y.S.2d 733, 442 N.E.2d 1244. Consequently, since Oriental Art had no ongoing value apart from its physical assets, the good will built up by Fedder in the business is not properly recoverable as an item of damages. Even if proximate cause was present, the Magistrate correctly denied any award for the lost value of the business' good will.

### 7. *Lost Sales*

Neither party raises any objection to the Magistrate's award of $13,400 to Oriental Art for three sales allegedly lost as a result of the accident (R.32–33). Nor are there any objections to the Magistrate's determination that Oriental Art is entitled to recover pre-judgment interest on this award at 6% per annum from May 29, 1979, to June 24, 1981, inclusive, and 9% per annum thereafter. In the absence of any objections, we adopt the Magistrate's findings as to this item of damages and the pre-judgment interest to which Oriental Art is entitled.

Since no objections are raised to the report other than those noted in this opinion, the court adopts the Magistrate's findings and recommendations as to plaintiffs' remaining claims for damages.

### *Conclusion*

With the exceptions noted in this opinion, the recommendations in the Magistrate's report are approved and adopted by this court. Accordingly, damages are awarded in favor of plaintiff Oriental Art in the amount of $232,178.50, allocated as follows: $202,675.50 for lost inventory; $13,400 for lost sales; $16,103 for lost profits. Pre-judgment interest on the awards for lost inventory and lost sales will be 6% per annum from May 29, 1979 through June 24, 1981, inclusive, and 9% per annum thereafter. Pre-judgment interest on the award for lost profits will be 6% per annum from December 1, 1979 through June 24, 1981, inclusive, and 9% thereafter. Plaintiffs are awarded the costs of this action.

A final judgment will be entered in accordance with this opinion.